GREGORY, Circuit Judge,
dissenting.
Consolidation Coal Company (“Consol”) disputes the Administrative Law Judge’s (“ALJ”) conclusion that Theodore Latusek is entitled to benefits under Title VI of the Federal Coal Mine Health and Safety Act of 1969 (“Black Lung Benefits Act” or “BLBA”); 30 U.S.C. §§ 901-45 (West 1986 & Supp.2003). On July 5, 1994, Latusek, who had never been a smoker, filed a disability claim, after retiring from twenty-four years of coal mine employment. The parties do not dispute that Latusek suffers from a totally disabling pulmonary condition; however, Consol’s experts claim that the etiology of Latusek’s impairment is unknown, while Latusek’s physicians maintain that his condition was caused by occupational coal dust exposure.
In three separate opinions, the ALJ has consistently concluded that Latusek demonstrated that he was entitled to black lung benefits. The ALJ’s conclusion was affirmed on two separate occasions by the Benefits Review Board (“BRB”).[1] Consol, Latusek’s former employer, appeals the BRB’s most recent order affirming the ALJ’s decision to award black lung benefits. After reviewing the entire record, I find there is substantial evidence to support the ALJ’s decision. Accordingly, for the reasons that follow, I respectfully dissent.
I.
The majority asserts that it reviewed the ALJ’s order under the “substantial evidence” standard, which is far more deferential than de novo review. Under the substantial evidence standard, reviewing courts are prohibited from substituting their judgment for that of the ALJ. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990) (“Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the court, to make findings of fact and to resolve conflicts in evidence.”). The majority ignores this well established principle of appellate review by concluding that it was irrational for the ALJ to rely on the opinions of Drs. Jennings and Rose more than those of Drs. Renn, Morgan, Fino, and Kleinerman. Because the ALJ is in a better position to make credibility determinations, I cannot agree with the majority’s decision to substitute its judgment for that of the ALJ. If substantial evidence supports the ALJ’s credibility decisions, which I submit it does, then the ALJ’s decision must be affirmed.
II.
The majority asserts that it was error for the ALJ to discredit the expert opinions of Drs. Renn, Morgan, Fino, and Kleinerman “solely because they were ‘able to draw a conclusion as to what is not the cause of claimant’s IPF when they cannot even give an opinion as to the cause of this disease.’ ” Ante, at 376. This asser *379 tion is not entirely accurate. A review of the record reveals that the ALJ did not discredit the opinions of Drs. Renn, Morgan, Fino, and Kleinerman solely because they could not determine the etiology of Latusek’s disability, even though they were certain it was not attributable to coal dust exposure. Rather, in the ALJ’s third decision and order, he finds “Dr. Jennings [sic] and Roses’s credentials regarding IPF [to be] superior to the credentials of Drs. Kleinerman, Renn, Morgan, and Fino, and accord their opinion great weight.”[2] (J.A. 541.)
The law instructs that, particularly in black lung cases, the ALJ “is not bound to accept the opinion or theory of any medical expert.” Underwood v. Elkay Mining, Inc., 105 F.3d 946, 949 (4th Cir.1997). Rather, it is the ALJ’s responsibility to “evaluate the evidence, weigh it, and draw his own conclusion.” Id. The ALJ reviewed and weighed the evidence in this case not once, but three times, and on each occasion, the ALJ concluded that Latusek was entitled to black lung benefits. In reviewing the ALJ’s conclusions, “[w]e must sustain the ALJ’s decision, even if we disagree with it, provided the determination is supported by substantial evidence .... ” Smith v. Chater, 99 F.3d 635, 637-38 (4th Cir.1996). A review of the physicians’ respective qualifications reveals that the ALJ’s decision to accord greater weight to the opinions of Drs. Jennings and Rose was supported by substantial evidence.
Dr. Cecil Rose, one of Latusek’s treating physicians, is “board certified in internal medicine, pulmonary diseases, and occupational medicine.” (J.A. 527.) Moreover, she is employed at the National Jewish Center (“NJC”), which is a premier institution treating interstitial pulmonary fibrosis. Additionally, Dr. Rose is a member of the Committee on Pneumoconiosis for the American College of Radiology and the Chair of the Committee for the Association of Occupational and Environmental Clinics. (J.A. 233.) She was also a certified “B” reader for chest x-rays.[3] During her deposition, Dr. Rose estimated that throughout her career she has evaluated approximately more than one hundred patients for coal worker’s pneumoconiosis (“CWP”) and other coal mine dust-related diseases. (J.A. 234-235.) She also evaluated Latusek on several occasions, beginning in 1993, when she documented his occupational history. Undoubtedly, Dr. Rose has considerable experience in diagnosing and treating CWP. Given Dr. Rose’s credentials and experience, there was substantial evidence in the record to support the ALJ’s decision to rely upon her diagnosis of CWP and her conclusion that Latusek’s condition was caused by his occupational exposure.
Likewise, substantial evidence supports the ALJ’s determination that the opinion of Dr. Constance Jennings was credible. Dr. Jennings is also a staff member of the NJC, and she is board certified in internal medicine, pulmonary diseases, and critical care medicine. Additionally, Dr. Jennings is the Clinical Director of the Interstitial Lung Disease Laboratory at the NJC, (J.A. 528), and an assistant professor with the University of Colorado Medical School, where her primary teaching responsibility *380 is in the area of interstitial lung diseases. (J.A. 285-86.) Before joining the NJC, Dr. Jennings was a staff member at the National Institute of Health (“NIH”) for two years, where she worked exclusively in the area of interstitial lung diseases. (J.A. 286.) Since joining the NJC, her primary focus has been on interstitial lung diseases. Id. During her deposition, Dr. Jennings testified that she has evaluated and/or treated approximately 50 to 100 patients at the NJC “who have worked in and about coal mines who have an interstitial-type lung disease.” (J.A. 289.) Further adding to Dr. Jennings’s credentials is the fact that she has published several articles on IPF.
On the other hand, the following doctors each testified that the etiology of Latusek’s disability was unknown, despite having positively concluded that it was not related to coal dust exposure. Dr. Kleinerman, the former Director of the Department of Pathology at the Metro Health Campus of Case Western Reserve University, (J.A. 339), never examined Latusek, but he reviewed his medical records and biopsy slides and concluded “with reasonable medical certainty” that Latusek’s lung disease “can not be attributed to coaldust [sic] exposure or simple coalworkers [sic] pneumoconiosis.” (J.A. 57.) Additionally, Dr. Kleinerman is not board certified in internal medicine or pulmonary diseases, and he is not a certified “B” reader because he has never taken the necessary examination. (J.A. 344.)
Dr. W.K.C. Morgan is also not board certified in pulmonary diseases or internal medicine. (J.A. 530). He is a fellow of the Royal College of Physicians of Edinburgh, “which he testified is somewhat equivalent to U.S. board certification, although he was not required to take any medical boards.” Id. (emphasis added.) Dr. Morgan reviewed Latusek’s medical records and submitted a report, wherein he stated that Latusek had “minimal evidence of coal workers’ pneumoconiosis” and that he did “not believe that the interstitial fibrosis present in Mr. Latusek is a result of coal worker’s pneumoconiosis.... ” (J.A. 175.)
Dr. Fino is board certified in pulmonary diseases and internal medicine, and he is also a certified “B” reader. (J.A. 402.) However, unlike Dr. Jennings, he has not published any articles relating to coal workers’ pneumoconiosis. Id. Dr. Fino examined Latusek on August 24, 1995, and later diagnosed him with “simple coal workers’ pneumoconiosis” and “an idiopathic interstitial pulmonary fibrosis.” (J.A. 184.) Dr. Fino concluded that Latusek has a “significant pulmonary impairment characterized by progressive restrictive lung disease which has worsened significantly since 1990.” Id. Despite this conclusion, Dr. Fino ultimately opined that Latusek’s “impairment and disability would be present had he never stepped foot in the coal mines.” (J.A. 186.)
Dr. Renn is board certified in internal medicine and the subspecialty of pulmonary diseases. He is also a certified “B” reader of x-rays. He treated Latusek over the course of three years, from April 14, 1992 through April 25, 1995. (J.A. 501.) Dr. Renn ordered Latusek’s first lung biopsy, which was performed in June 1992. (J.A. 499.) Dr. Renn diagnosed interstitial pulmonary fibrosis (“IPF”). (J.A. 501.) Dr. Renn regularly sees and treats patients with CWP, which is why Latusek was referred to him. However, the ALJ noted that Dr. Renn “explicitly stated in his deposition that he referred claimant to the National Jewish Center because his treatment plan was not working and because of the Center’s expertise in treating patients unth IPF.” (J.A. 541) (emphasis added.)
Drs. Rose and Jennings relied on the following clinical findings to reach them *381 conclusions that Latusek’s condition was related to coal dust exposure: (1) the unusually early onset of the disease in Latusek, who was only 39 years old, (2) his heavy exposure to silicates or coal mine dust, (3) a finding of pneumoconiosis combined with his exposure, (4) the presence of emphysema in a non-smoker, (5) the unusual nature of Latusek’s IPF lesion, and (6) the abnormally elevated cell count in his lungs, which indicated the presence of an irritant in the lung. Clearly, there was more than a mere scintilla of evidence supporting Drs. Rose’s and Jennings’s conclusion that Latusek’s IPF was caused by his coal dust exposure. Accordingly, the ALJ’s decision to give greater credence to the opinions of Drs. Jennings and Rose was appropriate.
III.
Next, the majority holds that there was substantial evidence to conclude that Drs. Jennings and Rose relied upon on the “flawed” articles in determining that Latusek’s disability was related to coal dust exposure. Ante, at 377. I respectfully disagree. Dr. Rose testified in her deposition that “[tjhere’s enormous uncertainty about th[e] relationship [between CWP and IPF], but there is data emerging to suggest that there may be a relationship between exposure to occupational dust with the subsequent development of pneumoconiosis .... ” (J.A. 244.) Although acknowledging the research, Dr. Rose stated that she did not “wish to ignore the uncertainty associated with [her] opinion,” (J.A. 245), but she ultimately concluded as follows:
it is my opinion, to a reasonable probability, that in Mr. Latusek’s case, given the atypical nature and presentation of his lesion and given his history of coal mine dust exposure and the associated finding of simple coal worker’s pneumoconiosis with emphysema, that the two [Latusek’s work exposure and his condition] are related, and that his occupational exposure to coal mine dust probably did have an association with his subsequent development of his IPF-type condition.
(J.A. 246).
Likewise, Dr. Jennings also testified in her deposition about the increasing amount of research being done regarding the connection between exposure to silicates and IPF. (J.A. 303-308.) However, when asked how she was able to link Latusek’s disease to his coal mine employment, Dr. Jennings replied:
there’s probably a number of pieces of evidence that could be used to support the contention that his disease is due to the silicates. First we have discussed, one, his age; secondly, would be his heavy exposure, which just based on history of quite an extensive exposure involving a lot of drilling and long wall exposure. Thirdly, would be the histologic evidence ... [which] demonstrates silicates exposure with findings compatible with simple coal worker’s pneumoconiosis and silicate deposition. There is evidence of injury to the small airways. There’s evidence of emphysema in a nonsmoker.... And finally, in the areas of peripheral fibrosis, even in the areas of honeycomb, silicate deposits are seen within the areas of honeycomb, strongly indicating silicates in the pathogenesis of the fibrotic process.
(J.A. 309-310.) Based upon Drs. Jennings’s and Rose’s deposition testimony, it is clear that they did not rely solely on the three related articles to determine that Latusek’s condition was caused by his coal dust exposure. The majority incorrectly determines that substantial evidence supports a conclusion that Latusek’s physicians relied upon the “flawed” articles. In fact, a review of the record reveals the opposite conclusion; the physicians merely acknowledged the research being done to *382 support a connection between IPF and CWP. Despite acknowledging this growing area of research, their conclusions were based primarily upon Latusek’s medical, histologic, and employment background, rather than on the articles. Accordingly, I disagree with the majority’s conclusion on this issue.
IV.
In sum, I believe there was substantial evidence in the record to support the ALJ’s factual findings that Drs. Jennings’s and Rose’s opinions were entitled to more weight than the opinions of Drs. Renn, Morgan, Fino, and Kleinerman. Likewise, the ALJ’s factual finding that Consol’s experts were less experienced in IPF is supported by substantial evidence. Therefore, while the majority may have reached a different conclusion after reviewing the record de novo, we should not disturb the ALJ’s factual findings under the substantial evidence standard. Accordingly, I maintain that the ALJ’s decision should be upheld.

. In the BRB's second opinion, it affirmed in part the ALJ's discrediting of Drs. Naeye and Spagnolo, but vacated the weight accorded by the ALJ to the opinions of Drs. Renn, Fino, and Morgan. Consequently, the BRB vacated the ALJ’s order and remanded for further proceedings. (J.A. 536, 538.)

. In its final opinion, the BRB specifically affirmed the ALJ’s decision to accord more weight to Drs. Jennings and Rose. In particular, the BRB held that, ”[b]ecause the administrative law judge acted within his discretion in finding the opinions of Drs. Jennings and Rose to be credible, we reject employer's allegation of error.” (J.A. 547.)

. Dr. Rose subsequently decided not to seek recertification, because she "didn’t want to keep reading the films.” (J.A. 234.)